NOT RECOMMENDED FOR PUBLICATION
File Name: 22a0083n.06

No. 20-3880

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

FILED
Feb 24, 2022
DEBORAH S. HUNT, Clerk

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF OHIO |
| | ) | |
| SAAD SAKKAL, M.D., | ) | |
| | ) | |
| Defendant-Appellant. | ) | |
| | ) | |

Before: ROGERS, STRANCH, and DONALD, Circuit Judges.

ROGERS, Circuit Judge.

As a physician at Lindenwald Medical Association, defendant Saad Sakkal prescribed various controlled substances to help patients manage pain. Following a Drug Enforcement Administration investigation, a grand jury indicted Sakkal on thirty-nine counts related to the illegal distribution of controlled substances, which included two charges of illegal distribution that resulted in death. Sakkal was arrested, and the district court ordered that Sakkal be held without pretrial bond. After trial, the jury convicted Sakkal on all counts except for one death count and one count of using another person's registration number to prescribe controlled substances. Sakkal moved for a new trial and retained new counsel, who raised a claim of ineffective assistance of the previous trial counsel. Following a hearing on the question of whether previous counsel was ineffective, the district court denied Sakkal's motion. On appeal, Sakkal argues that (1) the trial

court improperly denied him bail; (2) the evidence was not sufficient to conclude that Sakkal's distribution of controlled substances caused a person's death; and (3) Sakkal received ineffective assistance of counsel at the plea-bargaining stage and during trial. None of these arguments warrants reversal.

Saad Sakkal practiced medicine at Lindenwald Medical Association from February 2015 to December 2016. Sakkal was licensed to practice medicine in Ohio and also had a DEA registration number to dispense Schedule II through Schedule V controlled substances. The DEA began investigating Sakkal's prescription practices after a referral from the Ohio Medical Board, which had received several phone calls from pharmacists about Sakkal issuing problematic prescriptions.

In June 2018, a grand jury returned a thirty-nine-count indictment against Sakkal: thirty counts of illegal distribution of a controlled substance in violation of 21 U.S.C. § 841(a)(1); two counts of distribution of a controlled substance that resulted in death in violation of 21 U.S.C. § 841(b)(1)(C); and seven counts of using the registration number of another to dispense a controlled substance in violation of 21 U.S.C. § 843(a)(2). The magistrate judge initially ordered a $250,000 bond. The Government appealed the magistrate judge's order, and the district court overruled the magistrate judge's determination and ordered the U.S. Marshals Service to place Sakkal in custody without bond.

At trial, the Government introduced testimony that Sakkal utilized several dangerous prescription methods. The Government's expert, Dr. Timothy King, testified that Sakkal was prescribing multiple substances that served the same purpose and that this "therapeutic duplication" risked "significant adverse effects, including respiratory sedation and death." Sakkal also prescribed several dangerous combinations of controlled substances, including:

(1) amphetamines and opioids; (2) methadone with a benzodiazepine and an amphetamine; and (3) opioids with a benzodiazepine and a muscle relaxant, Soma. Finally, Sakkal sometimes prescribed high amounts of controlled substances.

The Government also presented testimony that Sakkal ignored warning signs about the danger of his prescription practices. Employees at Lindenwald administered drug screens to determine if patients were taking their controlled substances as prescribed and to evaluate whether the patient was also taking illegal controlled substances. These drug screens operate as an objective method to ensure that controlled-substance prescriptions do not contribute to a risk of overdose or maintenance of an addiction. Sakkal's records indicated that his patients' drug screens sometimes revealed that patients were taking unprescribed controlled substances or were not taking prescribed controlled substances. Sakkal's records never showed that he discharged or disciplined a patient because of the concerning drug screens.

Sakkal also failed to use the Ohio Automated Rx Reporting System (OARRS) to monitor his patients' prescriptions for controlled substances. This system is designed to log all of a patient's controlled-substance prescriptions that are filled or dispensed in Ohio. This allows a physician to ensure that patients have not already received a prescription for their ailments and to confirm that patients have not been doctor shopping to obtain controlled substances. Even when other Lindenwald employees provided Sakkal with OARRS reports for his patients, he did not review the reports.

Several pharmacies became aware of Sakkal's prescription practices and began calling Lindenwald to discuss concerns about these practices. Sakkal met with at least three pharmacies to discuss these concerns, but he did not change his prescribing practices. Some pharmacies decided to stop filling Sakkal's prescriptions for controlled substances.

In addition to charging Sakkal with illegal distribution of controlled substances, the indictment charged Sakkal with two counts of illegally distributing controlled substances that resulted in a patient's death. One of these patients, Ashley Adkins, visited Sakkal for the first time in December 2015. After Sakkal conducted an examination in "medical student type fashion," he prescribed seventeen medications for Adkins, including a "fairly high dose" of a benzodiazepine and a muscle relaxant. On January 18, 2016, an anonymous caller reported to Lindenwald that Adkins was abusing her medications and looking to sell or trade them. That same day, Adkins returned for a second appointment and reported having anxiety and pain. Her medical record from that day states: "She appears to be under the influence of either drugs or alcohol. Her speech is very slurred, her balance is off." Despite these concerning signs, Sakkal prescribed Adkins another benzodiazepine and a low dose of oxycodone.

Following the appointment, Adkins went with her living companion, Chris Norvell, to fill her prescriptions. The two spent time together afterwards, and Adkins passed away during the night while Norvell was asleep. When Norvell woke up, he realized that Adkins had died and noticed that half the bottle of oxycodone was gone. A coroner performed an autopsy and concluded that Adkins died of benzodiazepine and oxycodone toxicity. The autopsy did not locate any fentanyl, cocaine, or marijuana in Adkins's blood. The toxicology report indicated that Adkins's benzodiazepine and oxycodone levels were outside the therapeutic ranges. On cross examination, however, King acknowledged that Adkins would have had appropriate levels of benzodiazepine and oxycodone in her system if she had taken Sakkal's prescriptions as directed.

The jury convicted Sakkal of thirty counts of illegally distributing a controlled substance, the death count involving Adkins, and six counts of using the registration number of another to dispense a controlled substance. Sakkal's counsel filed a motion for a new trial, and Sakkal hired

separate counsel to file supplements to the motion, asserting that Sakkal received ineffective assistance of trial counsel.  Sakkal argued that his trial counsel, among other things, provided ineffective assistance during the plea-bargaining process and by deciding not to call an expert witness.  The district court held an evidentiary hearing on the motion for a new trial.  At the hearing, Sakkal's trial counsel testified about his advice regarding the plea offer and the strategy behind his decision not to call an expert witness.  The district court denied Sakkal's motion for a new trial, reasoning that trial counsel's recommendation to "seriously consider" accepting the plea offer was competent advice.  The district court also concluded that Sakkal's trial counsel "conducted a reasonable examination" into the viability of calling expert witnesses in Sakkal's defense and that this strategy did not amount to ineffective assistance of counsel.  In the alternative, the district court concluded that Sakkal had not shown he was prejudiced by the alleged ineffective assistance of counsel.  Sakkal timely filed his notice of appeal.

Sakkal first argues that the district judge failed to grant him reasonable bail pursuant to 18 U.S.C. § 3142(f) and that the failure to give him reasonable bail violated his rights under the Sixth and Eighth Amendments.  This claim fails because Sakkal's subsequent conviction and sentencing render his pre-trial detention claims moot.[1]  Constitutional claims and 18 U.S.C. § 3142 claims to pretrial bail become moot once the defendant is convicted.  *United States v. Manthey*, 92 F. App'x 291, 297 (6th Cir. 2004) (citing *Murphy v. Hunt*, 455 U.S. 478, 481 (1982)) (constitutional claims); *United States v. Mattice*, No. 17-4276, 2018 WL 2945942, at *1 (6th Cir.

---

[1] To the extent that Sakkal argues that his detention prevented him from effectively communicating with his counsel to prepare his defense, the district court did not consider this ineffective-assistance-of-counsel claim in the post-trial evidentiary hearing or in its order denying the motion for a new trial.  This court generally does not consider an ineffective-assistance-of-counsel claim on direct appeal where there has not been an opportunity to develop an adequate record for review, *United States v. Williams*, 612 F.3d 500, 508 (6th Cir. 2010), and we therefore decline to review this claim on direct appeal.

June 11, 2018) (18 U.S.C. § 3142 claims); *see also United States v. Lyle*, 793 F.2d 1294, at *2 (6th Cir. 1986) (table). Once Sakkal was convicted on thirty-seven counts in the indictment, his claims concerning pretrial detention became moot because he was credited for the time he spent in detention.

Sakkal next asserts that the evidence presented during trial was insufficient to establish that he caused Adkins's death. The Government presented ample evidence, however, that the benzodiazepine and oxycodone prescribed by Sakkal were the but-for cause of Adkins's death, and this evidence was sufficient for the jury to convict Sakkal of the death count related to Adkins. As Sakkal concedes in his opening brief, Adkins filled her prescriptions from Sakkal on the day she died, and she took half of the bottle of oxycodone within a four-to-five-hour period the night she died. The coroner testified that Adkins had no fentanyl, cocaine, or marijuana in her system and that Adkins died from "both oxycodone and benzodiazepine toxicity." The Controlled Substances Act provides an enhanced penalty where "death or injury results from the use of" a controlled substance distributed in violation of 21 U.S.C. § 841(a)(1). *United States v. Jeffries*, 958 F.3d 517, 519 (6th Cir. 2020) (quoting 21 U.S.C. § 841(b)(1)(C)). To establish that a "physician violates the CSA in a manner that leads to the death of a patient," the "use of the drug must have been a but-for cause of the victim's death," *United States v. Volkman*, 797 F.3d 377, 392 (6th Cir. 2015), and such causation "exists where use of the controlled substance 'combines with other factors to produce' death, and death would not have occurred 'without the incremental effect' of the controlled substance," *id.* (quoting *Burrage v. United States*, 571 U.S. 204, 211 (2014)). Construing the Government's evidence in the light most favorable to the Government, *United States v. Williams*, 998 F.3d 716, 727 (6th Cir. 2021), a rational trier-of-fact could conclude

that Adkins would not have died without the use of the oxycodone and benzodiazepine prescribed by Sakkal.

Sakkal argues that he did not cause Adkins's death because, if Adkins had taken the benzodiazepine and oxycodone as Sakkal directed, she would not have died. But the causal relationship required to apply the penalty enhancement in 21 U.S.C. § 841(b)(1)(C) is "between the decedent's use of the controlled substance and the resultant death." *Jeffries*, 958 F.3d at 520. Thus, "[t]he question under this statute's language is whether death resulted from use of the controlled substance—not whether death was a foreseeable result of the defendant's § 841(a)(1) violation." *Id.* at 520–21. The enhancement therefore does not require the Government to prove that Sakkal directed Adkins to ingest lethal amounts of the controlled substances; rather, the Government satisfied its burden by demonstrating that Adkins died from ingesting the controlled substances Sakkal prescribed to her.

Sakkal contends that the but-for causation requirement for the § 841(b)(1)(C) penalty enhancement would put "every practicing physician in the United States at considerable risk." But this assertion fails to recognize that the Government must also prove, as it did here, that a physician distributed controlled substances without any legitimate medical purpose in violation of § 841(a)(1) in order to hold a physician criminally liable for a patient's overdose death.

In his reply brief, Sakkal argues for the first time that the evidence was insufficient for the jury to conclude that he prescribed controlled substances to Adkins without a legitimate medical purpose. But "an appellant abandons all issues not raised and argued in its initial brief on appeal." *Bard v. Brown Cnty.*, 970 F.3d 738, 751 (6th Cir. 2020) (quoting *United States v. Johnson*, 440 F.3d 832, 845–46 (6th Cir. 2006)). We have consistently refused to review arguments raised for the first time in a reply brief on appeal because the Government has not had an opportunity to

respond to the arguments. *United States v. Adams*, 598 F. App'x 425, 429 (6th Cir. 2015) (citing *United States v. Campbell*, 279 F.3d 392, 401 (6th Cir. 2002)). We therefore decline to review this sufficiency-of-the-evidence claim raised for the first time in his reply brief.

Sakkal next raises several ineffective-assistance-of-counsel claims on direct appeal. This court generally does not entertain ineffective-assistance-of-counsel claims on direct appeal because there has not been an opportunity to develop an adequate record to evaluate the merits of the allegations. *United States v. Williams*, 612 F.3d 500, 508 (6th Cir. 2010). "Such claims 'are more properly available in a post-conviction proceeding under 28 U.S.C. § 2255, after the parties have had the opportunity to develop an adequate record on the issue from which the reviewing court is capable of arriving at an informed decision.'" *Id.* (quoting *United States v. Rahal*, 191 F.3d 642, 645 (6th Cir. 1999)). Only two of Sakkal's claims are properly presented for review, the district court having developed a record below on those two issues by holding a hearing and evaluating Sakkal's arguments. Accordingly, we review Sakkal's two ineffective-assistance-of-counsel claims for which there is an adequate record for review, and we decline to review Sakkal's remaining ineffective-assistance-of-counsel claims on direct appeal.[2]

First, Sakkal contends that his trial counsel's actions during the plea-bargaining process amounted to ineffective assistance of counsel under *Strickland v. Washington*, 466 U.S. 668 (1984). Sakkal fails to establish this claim because he does not show that his counsel's advice

---

[2] To be clear, the claims we decline to review include: Sakkal received ineffective assistance of counsel because he could not communicate with his counsel while detained to prepare his defense; Sakkal's counsel did not file any motions in limine concerning the DEA phone call or the limits of Dr. King's testimony; Sakkal's counsel did not object to testimony by the computer programmer; Sakkal's counsel did not object to testimony by a pharmacist; Sakkal's counsel did not object to a witness's testimony about an uncharged death; Sakkal's counsel did not object to the testimony of a former employee's opinion; and Sakkal's counsel did not object to the jury instructions about the necessary intent required to convict Sakkal.

constituted deficient performance. In determining that Sakkal's trial counsel gave competent advice about whether to accept the plea offer, the district court credited the testimony of Sakkal's counsel that, shortly before the trial began, he discussed the terms of the plea bargain with Sakkal and told him to "seriously consider taking the plea offer" because it was substantially below the minimum term Sakkal faced if convicted on the death counts. Sakkal's counsel explained that Sakkal would likely have to serve only a short term of imprisonment under the plea offer because of the time he had already served in pretrial detention and the opportunities he would have with the Bureau of Prison to receive good-credit time and to serve the final six months of his term in a halfway house. Reviewing these factual findings for clear error, *Logan v. United States*, 910 F.3d 864, 868 (6th Cir. 2018) (citing *Guerrero v. United States*, 383 F.3d 409, 414 (6th Cir. 2004)), the district court did not clearly err in crediting the testimony of Sakkal's previous trial counsel. Sakkal must show that this performance by his counsel was deficient and that he suffered prejudice because of the deficiency to succeed on his ineffective-assistance-of-counsel claim. *Strickland*, 466 U.S. at 687.

Sakkal argues that his counsel's recommendation was insufficient because it came after months "of insincere assessments of his chances at trial and unreal expectations of an 'acquittal' and 'exoneration' when no actual preparations for success were being made by" his counsel. But the district court correctly noted that, in a previous hypothetical discussion between Sakkal and his trial counsel, Sakkal stated that he did not want to take a three-year plea offer because he thought he was innocent. And "[t]he decision to plead guilty—first, last, and always—rests with the defendant." *Smith v. United States*, 348 F.3d 545, 552 (6th Cir. 2003). Although Sakkal is entitled to effective assistance of counsel once the Government offered him a plea bargain, *Logan*, 910 F.3d at 871 (quoting *Lafler v. Cooper*, 566 U.S. 156, 168 (2012)), Sakkal has not shown that

his counsel's recommendation that Sakkal "seriously consider" the plea offer amounted to deficient performance in light of Sakkal's previous hesitancy to consider a three-year plea deal.

Second, regarding his trial, Sakkal arguably renews his claim from below that his counsel's trial strategy not to call an expert witness amounted to ineffective assistance of counsel. *See* Appellant's Brief at 55–56. But Sakkal fails to show that his trial counsel's performance was deficient. As the district court noted, Sakkal's trial counsel testified that he decided not to call an expert after he consulted with two potential experts. One of these experts informed Sakkal's counsel that a battle-of-the-experts strategy had been unsuccessful in other cases and that "in his opinion, there would not be an expert that would be able to testify" for Sakkal and defend his prescribing practices. Sakkal's counsel therefore decided that the best strategy would be to argue that Sakkal prescribed the medications in good faith and lacked the necessary criminal intent. To succeed on his claim, Sakkal must "overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'"[3] *Stojetz v. Ishee*, 892 F.3d 175, 193 (6th Cir. 2018) (quoting *Strickland*, 466 U.S. at 689). Sakkal does not present any other evidence that his counsel's trial strategy was deficient. In the absence of deficient performance by Sakkal's counsel on either ineffective-assistance-of-counsel claim, these claims are without merit, and we need not address the district court's alternative conclusions that Sakkal failed to establish prejudice for either claim.

---

[3] In his reply brief, Sakkal appears to imply, in his argument about the causation issue, that the expert-witness decision was deficient because his counsel should have called him to testify and explain his treatment protocols to rebut the Government's evidence. But we do not consider arguments raised for the first time in a reply brief, *Bard*, 970 F.3d at 751, and Sakkal therefore forfeits this argument. In any event, the district court correctly noted that Sakkal's counsel decided not to call Sakkal as a witness because he believed Sakkal had lied to him and that the Government could discredit his testimony on cross examination. Sakkal does not explain how this tactical decision about his credibility would amount to deficient performance.

For the foregoing reasons, we affirm the judgment of conviction and the district court's judgment with regard to two of Sakkal's ineffective-assistance-of-counsel claims.